DE'VON L. WALKER,

                    Plaintiff,

            v.                                    Case No. 14-cv-1504-pp

KYLE K. TRITT, MICHAEL VANDERBUSH,
LINDSEY JANSEN, TIMOTHY J. BAUMANN,
JESSE JONES, ANNE SLINGER,
GREG STRUNZ, and BRIAN SCHMIDT,

                    Defendants.

---

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS FOR PLAINTIFF'S
FAILURE TO PROSECUTE (DKT. NO. 67); GRANTING SUMMARY
JUDGMENT AS TO DEFENDANTS TRITT, VANDERBUSH, BAUMANN,
JONES, STRUNZ AND SCHMIDT, DENYING SUMMARY JUDGMENT AS TO
DEFENDANTS JANSEN AND SLINGER (DKT. NO. 41) AND RECRUITING
*PRO BONO* COUNSEL FOR THE PLAINTIFF**

---

The court allowed plaintiff De'Von L. Walker, a state prisoner, to proceed

on claims under 42 U.S.C. §1983 that the defendants were deliberately

indifferent to his serious medical needs. Dkt. No. 12.

## I.    MOTION TO DISMISS (DKT. NO. 67)

The defendants filed a motion for summary judgment on May 6, 2016.

Dkt. No. 41. The court granted the plaintiff two extensions of time to file his

response to that motion. Dkt. Nos. 63, 66. When those deadlines had passed

and the plaintiff still had not filed his response, the defendants filed a motion

asking the court to dismiss the case due to the plaintiff's failure to prosecute.

Dkt. No. 67. The court then issued an order giving the plaintiff one more

extension of time to respond, and warning the plaintiff that it would grant the

defendants' motion to dismiss if he did not respond by that date. Dkt. No. 68. The plaintiff finally filed his response materials to the defendants' motion for summary judgment on December 22, 2016, dkt. nos. 69-81, and the defendants filed their reply materials on January 5, 2017, dkt. nos. 82-84.

The court will deny the defendants' motion to dismiss for failure to prosecute, dkt. no. 67, and consider the defendants' fully briefed motion for summary judgment.

## II.    MOTION FOR SUMMARY JUDGMENT (DKT. NO. 41)

### A.    Relevant Facts[1]

#### 1.    *Parties*

At the time he filed his complaint, the defendant was an inmate at Waupun Correctional Institution (Waupun). Dkt. No. 43 at ¶1.

Defendant Gregory Strunz was employed as a correctional officer at Waupun. Id. at ¶7. On January 2, 2014, Strunz was assigned as the first shift Segregation Officer 1 in the segregation unit, from 6:00 a.m. to 2:00 p.m. Dkt. No. 45 at ¶5. Defendant Jesse Jones, a correctional officer at Waupun, also

---

[1] The court takes the facts from the parties' submissions regarding their proposed findings of fact, including "Defendants' Proposed Findings of Fact," dkt. no. 43, "Plaintiff's Supported Findings of Fact," dkt. no. 71, "Plaintiff's Statement of Disputed Factual Issues," dkt. no. 72, "Defendants' Response to Plaintiff's Proposed Findings of Fact," dkt. no. 83, and "Defendants' Reply to Plaintiff's Response to Defendants' Proposed Findings of Fact," dkt. no. 84. The court also has considered the plaintiff's affidavits and his exhibits, dkt. nos. 73, 75-81, as well as his sworn complaint, dkt. no. 1, which can be construed as an affidavit at the summary judgment stage. See Ford v. Wilson, 90 F.3d 245, 246-47 (7th Cir. 1996). The court incorporates only facts that are supported or disputed by admissible evidence. See Fed R. Civ. P. 56(c)(1). The court will note disputes of fact.

was assigned to the segregation unit on first shift that day. Dkt. No. 46 at ¶¶2, 5. Defendant correctional officer Brian Schmidt also worked first shift on January 2, 2014. Dkt. No. 50 at ¶¶2, 5.

During second shift on January 2, 2014, defendants Lindsey Jansen and Timothy Baumann were working as correctional officers in the segregation unit at Waupun. Dkt. No. 44 at ¶¶2, 5; Dkt. No. 47 at ¶¶2, 5. Defendant Kyle Tritt, a supervising officer, and defendant Michael Vanderbush, a correctional sergeant, also worked that shift. Dkt. No. 52 at ¶¶2, 5; Dkt. No. 53 at ¶¶2, 5.

Defendant Ann Slinger was employed by the Wisconsin Department of Corrections (DOC) as a Nurse Clinician 2 at Waupun. Dkt. No. 51 at ¶2.

2. *First Shift on January 2, 2014*

a. Strunz

On January 2, 2014, the plaintiff was housed in cell A-212 in the segregation unit at Waupun. Dkt. No. 73 at ¶3. Strunz was assigned to the control center unit, which is commonly referred to as the bubble. Dkt. No.43 at ¶¶10-11. Strunz was responsible for verbally responding to inmates who pressed the emergency call buttons located in their cells. Id. at ¶12. Strunz could not leave the bubble to respond to inmate emergency calls because the bubble must be staffed at all times. Id. at ¶13. If an inmate was experiencing a medical emergency, Strunz would notify security or nursing staff on duty to report to the inmate's cell. Id. at ¶14.

3

Strunz averred that the plaintiff pressed his emergency call button twice during Strunz's shift—once at 11:00 a.m. and once at 1:00 p.m. Id. at ¶15. On both occasions, Strunz was unable to understand what the plaintiff was saying into his intercom, so Strunz alerted floor staff to check on the plaintiff. Id. at ¶16. Since the bubble had to be staffed continuously, Strunz was not able to leave to check on the plaintiff, but said that he had no reason to believe that floor staff did not properly respond to the plaintiff's cell. Id. at ¶17. The floor staff did not notify Strunz that any further action was necessary, and Strunz indicated that he had no further involvement with the plaintiff on January 2, 2014. Id. at ¶18.

The plaintiff says he pushed his emergency call button much more often—at 9:00 a.m., 11:00 a.m., between 12:30 and 12:45 p.m. and 1:00 p.m.; he also had an inmate in the cell next door press his button. Dkt. No. 72 at ¶¶2-7; Dkt No. 73 at ¶¶3-10. In his first two calls, the plaintiff described his symptoms of dizziness, headache, nausea, lethargy, and lightheadedness, but no correctional officers responded to his cell after his first two calls. Id.

According to the plaintiff, Strunz would have known if floor staff never checked on the plaintiff, because there were cameras in the bubble that could see down the hallways and it would have been one of Strunz's duties as segregation officer one to check those cameras. Dkt. No. 72 at ¶¶3-4. The plaintiff alleged that Strunz also could have utilized his walkie talkie to check

to see if the previously summoned floor staff had responded to the plaintiff's cell. Id. at ¶3

At approximately noon, the plaintiff lost consciousness; he fell and struck his head on either the sink or the toilet in his cell. Dkt. No. 73 at ¶7. The plaintiff regained consciousness sometime between 12:30 p.m. and 12:45 p.m. Id. at ¶8. He immediately pressed the medical alert button again and attempted to tell the correctional staff what had transpired, but staff disconnected the call while the plaintiff was talking. Id.

The plaintiff got the attention of the inmate in the next cell, A-211. Id. at ¶9. That inmate told the plaintiff that the inmate had pressed his button and told staff that the plaintiff needed medical assistance. Id.

The plaintiff pressed his medical alert button at 1:00 p.m. and told Strunz that not only was he not feeling well, but that he had suffered an injury because he had not received medical assistance. Id. at ¶10. According to the plaintiff, Strunz could see whether another officer responded to the plaintiff's calls through video cameras in the segregation hallway and it was part of his duty to do so. Id. at ¶11.

b.    Jones

Jones responded to the plaintiff's cell at approximately 1:05 p.m. to inquire about the plaintiff possibly needing emergency medical attention. Dkt. Id. at ¶14. After talking to the plaintiff and seeing that he was injured and in need of medical assistance, Jones walked away and said he would check to see

if he could get a nurse. Id. Jones returned about 1:15 p.m. to escort the plaintiff to the nurses' station. Id. at ¶15.

Jones stated that he and other officers working first shift on January 2, 2014 conducted rounds of the segregation unit from 6:00 a.m. until 2:00 p.m., approximately every thirty minutes. Dkt. No. 43 at ¶20. This was in addition to passing out medications, delivering meal trays and collecting meal trays. Id. The plaintiff was checked on, under policy and procedure, at least twice per hour during first shift. Id. at ¶21.

The plaintiff says that Jones did not conduct the wellness rounds at thirty-minute intervals; he estimates that Jones did wellness checks a maximum of seven times. Dkt. No. 73 at ¶¶12-13.

c. Schmidt

Schmidt said that neither Strunz nor anyone else told him that the plaintiff needed medical attention or needed to be evaluated or seen during first shift on January 2, 2014. Dkt. No. 43 at ¶19.

3. *Slinger Assessment*

At 1:18 p.m., Nurse Slinger saw the plaintiff. Dkt. No. 43 at ¶23. She performed a medical examination on the plaintiff following an incident where he reportedly became dizzy and fell, hitting his head in his cell. Id. Slinger noted that the plaintiff had a lump on the right side of his forehead and that he had pain at the injury site. Id. at ¶24. She also recorded the plaintiff's vital signs and assessed the plaintiff's psychological, respiratory, EENT (eyes, ears,

nose, and throat), cardiovascular, gastrointestinal, neurological, dermatological and musculoskeletal systems. Id. at ¶25. Slinger noted that the plaintiff was clear of pain or abnormalities in all areas except his reported headache and dizziness. Id. at ¶26. The plaintiff's blood pressure was also slightly elevated. Id.

Slinger gave the plaintiff Ibuprofen to control the pain, and advised him to move slowly when changing positions and to increase his fluid intake to maintain hydration to decrease the dizziness. Id. at ¶27. Slinger advised the plaintiff to submit a Health Service Request if he needed further care, and the plaintiff expressed his understanding of Slinger's instructions. Id. at ¶28.

Slinger determined the plaintiff did not need further treatment at that time, unless his condition did not improve. Id. at ¶29. Slinger based her determination on her medical training and experience, the plaintiff's clear speech, steady gait, round and reactive pupils, and her assessment that he was alert and oriented. Id. Slinger reviewed her assessment with the nurse practitioner on staff, who agreed with Slinger's treatment recommendations and did not prescribe any new orders. Id. at ¶30.

The plaintiff describes his time with Slinger as a very brief visit. Dkt. No. 73 at ¶16. According to the plaintiff, he told Slinger about his symptoms of dizziness, nausea, headache and lightheadedness. Id. The plaintiff alleges that Slinger took the plaintiff's blood pressure and other vital signs; she also noted in the chart that the plaintiff had a contusion to his head. Id. Slinger then sent

the plaintiff back to his segregation cell, where he was housed without further examination. Id. The plaintiff protested that he still did not feel well and that he had had a similar fall a month earlier where he was found lying unconscious. Id.

The plaintiff represents that he had a syncope (fainting) episode on December 3, 2013—about a month before the events described in the complaint. Dkt. No. 73 at ¶1-2. He says he was found unconscious in the Health Services Unit waiting room at Waupun. Id. Each of the defendants asserted that even if the plaintiff had fainted a month earlier, they were not aware of any previous incidents where the plaintiff had fainted or had seizure-like activity. Dkt. No. 43 at ¶22. The plaintiff disputes this, dkt. no. 71 at 3, but his assertion that he told Slinger about the previous episode on January 2, 2014 is the only evidence the plaintiff presents to contradict the averments of the defendants.

### 4. *Second Shift on January 2, 2014*

#### a. Jansen

During the second shift on January 2, 2014, Jansen was assigned as the Segregation Officer 1. Dkt. No. 43 at ¶31. There is a dispute of fact regarding the plaintiff's interaction with Jansen. According to Jansen, she did not receive an emergency call from the plaintiff during her shift. Id. at ¶32. Jansen says she received only one call during her shift that day, at approximately 7:00 p.m., from an inmate who reported that he was feeling suicidal. Id. at ¶33.

Jansen notified the sergeant on duty. Id. Jansen avers that she would have notified the sergeant or range officer on duty if the plaintiff had pressed his emergency call button and informed her that he was having a medical emergency. Id. at ¶34.

In contrast, the plaintiff avers that he pressed the medical alert call button at approximately 2:00 p.m. Dkt. No. 73 at ¶19. According to the plaintiff, Jansen answered the call and told the plaintiff that she was aware of the plaintiff's situation, but that medical staff already had seen the plaintiff once and "there was nothing she could do about it." Id. The plaintiff asked Jansen to call the nurse again because he "really did not feel good." Id. Jansen told the plaintiff to drink some water and lie down. Id.

b.     Baumann

Baumann conducted rounds of the segregation unit during second shift on January 2, 2014, approximately every thirty minutes between 6:30 p.m. and 8:30 p.m. Dkt. No. 43 at ¶36. The plaintiff disputes that Baumann did regular rounds, dkt. no. 73 at ¶20; dkt. no. 72 at ¶21, but does not present evidence to contradict the segregation rounds log and Baumann's affidavit. The plaintiff says there was a call that took Baumann away for fifty-five minutes during that time, so Baumann could not have done rounds every thirty minutes, dkt. no. 72 at ¶21, but the plaintiff does not provide documentation showing that Baumann was unable to do rounds. The segregation rounds log shows that

someone made rounds at 6:00, 6:30, 7:00, 7:30, 7:40, 8:00 and 8:30; the initials of the officers who made the rounds are illegible. Dkt. No. 47-1.

Baumann recalls that the plaintiff was in his bed during the first few rounds, and Baumann made the plaintiff move for him each time. Dkt. No. 47 at ¶7. Baumann did not observe anything unusual with the plaintiff until he was delivering medications to inmates in the segregation unit at approximately 8:15 p.m. Id. at ¶8. At approximately 8:15 p.m., while passing out medications, Baumann observed the plaintiff laying unresponsive on his belly on the floor of his cell. Dkt. No. 43 at ¶37. Baumann was unable to get a response from the plaintiff so he used his radio to call Vanderbush for help. Id. at ¶40.

In his affidavit, the plaintiff asserts (without support) that Baumann did not observe him acting normally before he found him unresponsive. Dkt. No. 72 at ¶22. The plaintiff also avers that he was left unconscious in his cell for upwards of an hour after asking for medical assistance. Id. at ¶23. The plaintiff presents no evidence to explain how he would know what happened while he was unconscious.

c. Vanderbush and Tritt

Vanderbush, Tritt and other available segregation staff arrived at the plaintiff's cell within a minute of Baumann's call. Dkt. No. 43 at ¶41. The plaintiff claims to dispute this and refers the court to his statement of disputed factual issues, dkt. no. 71 at 5-6, but that document states only that these defendants knew of and turned a blind eye to the conduct of their

10

subordinates, dkt. no. 72 at ¶¶26, 28. Again, the plaintiff presents no evidence as to how he would know how quickly other staff members responded after Baumann placed the call, given that he says that he was unconscious.

After the plaintiff became verbally responsive, he indicated that he was unable to get to the door, so Tritt ordered an emergency cell extraction. Dkt. No. 43 at ¶43. The plaintiff was transported to an examination room, where a nurse performed a medical assessment and determined that the plaintiff needed to be sent to the emergency department at Waupun Memorial Hospital. Id. at ¶44.

### 5. *Outside Medical Treatment and Discharge Instructions*

From Waupun Memorial Hospital, the plaintiff was transferred to the University of Wisconsin Hospital, where he was seen in the neurology department by Dr. Barend Lotz. Dkt. No. 43 at ¶47. Dr. Lotz provided a differential diagnosis of: (1) syncopal episode, (2) non-epileptic seizure/spell, and (3) malingering. Id. at ¶48. Dr. Lotz provided discharge recommendations that included no sleeping on bunk beds. Id. at ¶49. The recommendation from Dr. Lotz did not say how long he recommended that the plaintiff not sleep in a bunk bed. Id. at ¶56. The plaintiff suggests that the medical staff could have contacted the UW Hospital's neurology department if they had a question about Dr. Lotz's orders. Dkt. No. 71 at 7, ¶56.

The plaintiff returned to Waupun on January 3, 2014, and his discharge instructions from Dr. Lotz were reviewed by a nurse in the Health Services

Unit. Dkt. No. 43 at ¶50. Neither the nurse or the advanced care provider wrote down the recommendation from Dr. Lotz that the plaintiff not sleep in a bunk bed. Id. at ¶53.

When an inmate returns from an offsite provider, the nurse who receives his paperwork back from the offsite provider reviews it, writes down the recommendations from the offsite provider, then flags the orders in the chart for the advanced care provider to review. Id. at ¶51. Recommendations from offsite medical providers are only recommendations, and Health Services Unit staff members are not required to adopt the recommendations. Id. at ¶52.

At an appointment on January 7, 2014, nurse DeYoung used the findings from the University of Wisconsin Hospital paperwork to come up with a treatment for the plaintiff; the discharge paperwork was in the plaintiff's medical file. Dkt. No. 72 at ¶34.

When the plaintiff returned to Waupun on January 3, 2014, he was being housed in the segregation unit, which did not have bunk beds. Dkt. No. 43 at ¶55. The plaintiff was transferred to the general population on January 27, 2014, and given a low bunk. Id. He was given a top bunk on February 10, 2014. Id. The plaintiff disputes this proposed finding of fact, but he does not cite to any admissible evidence. Dkt. No. 71 at 7.

Slinger was not responsible for reviewing the discharge paperwork from the University of Wisconsin Hospital when the plaintiff returned to Waupun on January 3, 2014. Dkt. No. 43 at ¶54. Slinger also was not responsible for

writing up the orders from the discharge paperwork to be placed in the plaintiff's medical records. Id. The plaintiff disputes this, but does not cite to any admissible evidence. Dkt. No. 71 at 7.

6.    *Appointment with Slinger – February 13, 2014*

On February 13, 2014, at 1:38 p.m., Slinger had an appointment with the plaintiff, in response to a Health Service Request the plaintiff had submitted on February 10, 2014. Dkt. No. 43 at ¶57. At the appointment, the plaintiff complained about dizziness and headaches that were occurring approximately four times a week. Id. at ¶58. The plaintiff explained that his headaches did not usually last more than a day when the Ibuprofen helped. Id. at ¶59; Dkt. No. 72 at ¶35. The plaintiff also reported that he had fallen earlier in the week when he became dizzy trying to climb up to the top of his bunk bed. Dkt. No. 43 at ¶60. He said he injured his right shoulder. Id.

Slinger recorded the plaintiff's vitals and assessed his pain levels as well as his psychological, EENT, respiratory, cardiovascular, gastrointestinal, genitourinary-reproductive, neurological, and musculoskeletal systems. Id. at ¶61. The plaintiff's pulse was regular, but his blood pressure was slightly elevated and he had throbbing in his temple areas. Id.

Slinger advised the plaintiff to stay hydrated as much as possible since dehydration may have been making the headaches worse. Id. at ¶62. She also advised the plaintiff to move slowly to reduce dizziness. Id. Slinger asked the plaintiff to fill out a headache diary that she had previously given him. Id. She

told the plaintiff to submit a Health Service Request if his condition did not improve. Id. The plaintiff expressed that he understood Slinger's instructions. Id. at ¶65.

At this appointment, Slinger also referred the plaintiff to have an optical appointment. Id. at ¶63. She thought that poor eyesight might be causing the plaintiff's frequent headaches and dizziness. Id. The referral was to take place within fourteen days. Id. at ¶64.

There is a dispute of fact regarding whether the plaintiff requested a low bunk restriction during this appointment. According to the plaintiff, he specifically asked for a low bunk restriction during this appointment, but Slinger denied his request. Dkt. No. 72 at ¶37. He believes Slinger had the authority to grant a request for a low bunk restriction and submits a document that suggests that she did. Id. at ¶38; dkt. no. 83-1 at 10. The document is attached to Health Services Policy and Procedures 300:07 regarding "Medical/Dental Restrictions/Special Needs;" it is called, "Appendix 1: Restrictions/Special Needs." Dkt. No. 83-1 at 2, 7. In a section regarding House Requirements for Lower Bunk, the document says: "Acute injury (temporary restriction of 6 weeks or less) Does not require committee/nurse review and can be authorized by a nurse or prescriber." Id. at 10.

Slinger says the plaintiff did not specifically ask for a low bunk restriction during this appointment. Dkt. No. 43 at ¶70. If the plaintiff had requested a low bunk restriction, and Slinger determined that a low bunk

14

restriction was necessary, Slinger said that she could only give a temporary low bunk order pending a decision by a physician to assign the plaintiff to a low bunk restriction. Id. at ¶71. According to Slinger, she did not have the authority to admit or deny a request for a low bunk restriction. Id. at ¶72. The document submitted by the plaintiff and Slinger's own admission, however, indicate that she could grant a temporary low bunk order pending a decision by a physician.

According to Slinger, the plaintiff was responsible for putting in a Special Needs Request for a low bunk restriction, which he could have done by submitting a Health Service Request. Id. at ¶73. Nursing staff triage those requests and make sure they get to the appropriate staff. Id. Special Needs Requests are reviewed by the Special Needs Committee for a determination as to whether the requested item or restriction is medically necessary for the individual inmate. Id. at ¶74. Slinger was not a member of the Special Needs Committee. Id.

The plaintiff submits that he "could not have put in a low bunk restriction prior to March 5, 2014 by submitting a request to the Special Needs Committee because he had no way or reason for requesting such a restriction. As the recommendation and discharge order for 'no bunk beds' was only seen and held by the nursing staff and the plaintiff had no prior idea that any such restriction did exist." Dkt. No. 72 at ¶36. The timing the plaintiff mentions is inconsistent with his representation that he asked Slinger for just such a

15

restriction on February 13, 2014, but the statement could apply to the time before February 13, 2014, and he did not need to know about Dr. Lotz's recommendation to request a lower bunk at his appointment with Slinger.

7. *Subsequent Treatment by Dr. Manlove (not a defendant)*

The plaintiff had an appointment with Dr. James Manlove at noon on March 4, 2014. Dkt. No. 43 at ¶66. The plaintiff reported that he became dizzy getting out of his bed on March 2, 2014, and that he fell and injured his right hand and left wrist. Id. Dr. Manlove authorized a low bunk restriction for the plaintiff for three months, starting on March 5, 2015. Id. at ¶68.

X-rays taken on March 10, 2014 revealed that the plaintiff had suffered an "age indeterminate tiny avulsion fracture" of his right little finger and an "age indeterminate transverse scaphoid fracture" of his left wrist. Id. at ¶67.

B. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

16

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

C.    Deliberate Indifference to Serious Medical Need

"The Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011) (quoting Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 828 (7th Cir. 2009). "Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs." Arnett, 658 F.3d at 750 (citing Estelle v. Gamble, 4289 U.S. 97, 103 (1976)). "[A] claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition."

17

Arnett, 658 F.3d at 750 (citations omitted). "Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." Rodriguez, 577 F.3d at 828 (quoting Estelle, 429 U.S. at 103).

The defendants do not dispute that the plaintiff suffered a serious medical need. The court will focus only on the second prong of the deliberate indifference standard—whether the defendants acted with a sufficiently culpable state of mind.

"To demonstrate deliberate indifference, a plaintiff must show that the defendant acted with a sufficiently culpable state of mind, something akin to recklessness." Arnett, 658 F.3d at 751 (quotation omitted). A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. Roe, 631 F.3d at 857. "Deliberate indifference 'is more than negligence and approaches intentional wrongdoing.'" Arnett, 658 F.3d at 759 (quoting Collignon v. Milwaukee Cty., 163 F.3d 982, 988 (7th Cir. 1998)). "The deliberate indifference standard reflects a mental state somewhere between the culpability poles of negligence and purpose, and is thus properly equated with reckless disregard." Perez v. Fenoglio, 792 F.3d 768, 777 (7th Cir. 2015) (citation omitted)

### 1. *Strunz*

Although there is a dispute regarding the number of times that Strunz answered the plaintiff when the plaintiff pressed his emergency call button, there is no admissible evidence to contradict Strunz's averment that he alerted floor staff to check on the plaintiff. Dkt. No. 43 at ¶16. Due to his assignment that day, Strunz could not leave the bubble Id. at ¶¶10-11, 13, 17. Strunz had no reason to believe that floor staff did not properly respond to the plaintiff's cell; no one notified Strunz that further action was warranted. Id. at ¶17.

The plaintiff suggests actions that he believes Strunz should have taken to follow up after he asked floor staff to check on the plaintiff. For example, the plaintiff suggests that Strunz could have checked the cameras in the hallways to see whether staff responded, or could have used his walkie talkie to confirm that floor staff followed his order to respond to the plaintiff's cell. Dkt. No. 72 at ¶¶3-4. The fact that Strunz could have tried to confirm that the floor staff responded does not show that Strunz deliberately failed to act. He *did* act—he notified floor staff. Nor has the plaintiff presented evidence that Strunz answered when the plaintiff pressed his emergency call button between 12:30 p.m. and 12:45 p.m. When the Strunz received the plaintiff's call at 1:00 p.m., he once again sent floor staff to respond, and Jones arrived by 1:05 p.m. Dkt. No. 73 at ¶14.

The undisputed evidence, viewed in the light most favorable to the plaintiff, shows that Strunz responded to the plaintiff's use of the emergency

call button by sending floor staff to check on the plaintiff's cell. Any failure of staff to respond to the earlier calls was not Strunz's fault. No reasonable jury could conclude that his response of sending staff after the plaintiff pressed the emergency call button was deliberately indifferent to the plaintiff's serious medical need. The court will grant the defendants' motion for summary judgment as to Strunz.

2.    *Jones*

The plaintiff's allegations regarding Jones' personal involvement are limited to Jones responding to the plaintiff's cell at approximately 1:05 p.m., inquiring about the plaintiff possibly needing emergency medical attention, going to get a nurse, and returning ten minutes later to take the plaintiff to the nurses' station. Dkt. No. 73 at ¶¶14-15. Jones also participated in rounds of the segregation unit during first shift, passed out medication and delivered and collected meal trays. Id. at ¶¶20-21. No reasonable jury could conclude that Jones' actions during first shift on January 2, 2014 were deliberately indifferent to the plaintiff's serious medical needs. Like Strunz, Jones responded. The court will grant the defendants' motion for summary judgment as to Jones.

3.    *Schmidt*

Schmidt was not aware of the plaintiff's prior fainting episode, and there is no evidence that he was involved with the plaintiff at all on January 2, 2014. Dkt. No. 43 at ¶¶19, 22. Section 1983 limits liability to public employees who

are personally responsible for a constitutional violation. Burks v. Raemisch, 555 F.3d 592, 595-96 (7th Cir. 2009). For liability to attach, the individual defendant must have caused or participated in a constitutional violation. Hildebrandt v. Ill. Dept. of Natural Resources, 347 F.3d 1014, 1039 (7th Cir. 2003). Schmidt was not personally involved in any violation of the plaintiff's constitutional rights.

Contrary to the plaintiff's assertions that supervisors are liable for actions taken by their subordinates, §1983 does not allow actions against persons merely because of their supervisory roles. T.E. v. Grindle, 599 F.3d 583, 588 (7th Cir. 2010); Palmer v. Marion Cty, 327 F.3d 594 (7th Cir. 2003). The court will grant the defendants' motion for summary judgment as to Schmidt.

4.    *Jansen*

Jansen was assigned to the bubble during second shift on January 2, 2014. Dkt. No. 43 at ¶31. There is a dispute of fact regarding the plaintiff's interaction with Jansen. Jansen says she did not receive an emergency call from the plaintiff during her shift, id. at ¶32, but the plaintiff describes a conversation he had with her at approximately 2:00 p.m., dkt. no. 73 at ¶19.

The court must view the evidence in the light most favorable to the plaintiff, so the court will assume for the purposes of summary judgment that the plaintiff's version of events is true.  Accordingly, the court must consider whether Jansen was deliberately indifferent when she told the plaintiff she was

aware of his situation but "there was nothing she could do about it" because he had just been seen by medical staff. Id. When the plaintiff asked Jansen to call the nurse again because he "really did not feel good," Jansen simply told the plaintiff to drink some water and lie down. Id.

Jansen argues that over six hours lapsed between the plaintiff's call and when he passed out, but it is possible that prompt medical attention could have prevented the plaintiff's episode later in the evening. A reasonable jury could conclude that Jansen's refusal to contact medical staff or send someone to the plaintiff's cell to check on him constituted deliberate indifference to the plaintiff's need for additional medical attention. The court will deny the defendant's motion for summary judgment as to Jansen.

        5.    *Baumann*

Baumann conducted regular rounds of the segregation unit between 6:30 p.m. and 8:30 p.m. on January 2, 2014. Dkt. No. 43 at ¶36. Baumann specifically recalls that the plaintiff was in his bed during the first few rounds, because he made the plaintiff move for him each time. Dkt. No. 47 at ¶7. At approximately 8:15 p.m., while passing out medications, Baumann saw the plaintiff laying unresponsive on his belly on the floor of his cell. Dkt. No. 43 at ¶37. When Baumann was unable to get a response from the plaintiff, he used his radio to call Vanderbush for help. Id. at ¶40. Based on these undisputed facts, no reasonable jury could conclude that Baumann was deliberately indifferent to the plaintiff's serious medical need. He acted immediately to try to

get a response from the plaintiff, then to call for help. The court will grant the defendants' motion for summary judgment as to Baumann.

### 6. *Vanderbush*

Vanderbush responded to Baumann's call for assistance within one minute, then assisted with the plaintiff and the cell extraction. Dkt. No. 43 at ¶¶40-41, 43. No reasonable jury could conclude that Vanderbush was deliberately indifferent to the plaintiff. The court will grant the defendants' motion for summary judgment as to Vanderbush.

### 7. *Tritt*

The court also will grant the defendants' motion for summary judgment as to Tritt, because no reasonable jury could conclude that Tritt was deliberately indifferent to the plaintiff. Tritt also appeared within a minute of Baumann's call for assistance. Dkt. No. 43 at ¶41. Once the plaintiff was verbally responsive, Tritt ordered the emergency cell extraction so the plaintiff could be taken for medical treatment. Id. at ¶43.

### 8. *Slinger*

Finally, the court will consider whether Slinger was deliberately indifferent to the plaintiff's serious medical needs on January 2, 2014 or February 13, 2014.

On January 2, Slinger conducted a medical assessment of the plaintiff in the early afternoon following a syncope (fainting) episode. Although the plaintiff was upset that Slinger sent him back to his cell, it is undisputed that she

conducted a thorough evaluation, gave the plaintiff Ibuprofen, advised him to move slowly when changing positions and to increase his fluid intake to maintain hydration to decrease the dizziness. Dkt. No. 43 at ¶¶23-27. She also told the plaintiff to submit a Health Service Request if he needed further care. Id. at ¶28. The nurse practitioner on staff reviewed, and did not modify, Slinger's determination that the plaintiff did not need further treatment at that time. Id. at ¶¶29-30.

The court assumes for the purposes of summary judgment that the plaintiff advised Slinger of his previous fainting episode during this appointment. Even assuming that, no reasonable jury could conclude that Slinger was deliberately indifferent when she sent the plaintiff back to his cell with Ibuprofen and instructions to move slowly, increase his fluid intake, and submit a Health Service Request if he needed further care. The plaintiff may disagree with the treatment Slinger provided, but "neither medical malpractice nor a mere disagreement with a [medical professional's] medical judgment amounts to deliberate indifference . . . ." Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005) (citing Estelle, 429 U.S. at 106, Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261 (7th Cir. 1996)). The court will grant the defendants' motion for summary judgment as to Slinger's actions on January 2, 2014.

That leaves the plaintiff's February 13, 2014 appointment with Slinger. This appointment took place three days after the plaintiff was transferred to a top bunk in the general population at Waupun. Dkt. No. 43 at ¶55.

The plaintiff complained of dizziness and headaches that were occurring approximately four times a week, and he reported that he had fallen and injured his shoulder earlier in the week when he became dizzy trying to climb up to the top of his bunk bed. Id. at ¶¶58, 60. In addition to continuing her earlier advice regarding moving slowly and staying hydrated, Slinger asked the plaintiff to fill out a headache diary she had previously given him and referred him for an optical appointment because she thought poor eyesight might be causing the plaintiff's frequent headaches and dizziness. Id. at ¶¶62-63. Slinger again told the plaintiff to submit a Health Service Request if his condition did not improve. Id. at ¶62.

Even viewing the evidence in the light most favorable to the plaintiff, no reasonable jury could conclude that Slinger was deliberately indifferent to the plaintiff's medical needs on February 13, 2014, either in her examination or in the treatment she prescribed. She escalated the plaintiff to a specialist appointment because she thought poor eyesight might be causing the plaintiff's problems. She also asked the plaintiff to complete a headache diary to determine patterns or causes of the plaintiff's headaches and dizziness.

There is, however, a dispute of fact regarding whether the plaintiff requested a low bunk restriction at this appointment and whether Slinger denied that request. Viewing this evidence in the light most favorable to the plaintiff, a reasonable jury could conclude that Slinger denied the plaintiff's request for a low bunk restriction, and that given his history, that denial

constituted deliberate indifference. The plaintiff had fallen trying to get into his bed right after being moved to a top bunk, and he had reported incidents to Slinger on December 3, 2013, January 2, 2014 and February 10, 2014, in addition to the other headaches and dizziness. Slinger admits that she had the power to order at least a temporary low bunk restriction until a doctor could determine whether a longer low bunk order was appropriate. Id. at ¶71. She also could have told the plaintiff to submit a Special Needs Request for a low bunk restriction, but she did not. The court will deny the defendant's motion for summary judgment as to Slinger's denial of a low bunk restriction on February 13, 2014.

> D.    Qualified Immunity

The defendants have argued that they are entitled to qualified immunity. Qualified immunity "protects government officials from suit for damages when their conduct does not violate clearly established statutory or constitutional rights." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Determining whether a state official is entitled to qualified immunity involves two inquiries: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." Williams v. City of Chi., 733 F.3d 749, 758 (7th Cir.2013). If either inquiry can be answered in the negative, the official is entitled to summary judgment.

Courts may address the two prongs of qualified immunity in either order. Pearson, 555 U.S. at 236. A right is clearly established if a "reasonable official would have understood what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012) (internal quotations and brackets omitted).

The plaintiff argues that qualified immunity does not protect officials sued in their official capacities. Dkt. No. 70 at 26. The plaintiff did not sue Jansen and Slinger in their official capacities, however, and the court did not allow him to proceed on official capacity claims against them. Dkt. No. 1 at 1-4; Dkt. No. 12 at 10.

The defendants argue that because they raised the qualified immunity defense, they triggered the plaintiff's burden to show that the defendants' errors were clearly established; they assert that the plaintiff failed to meet that burden. Dkt. No. 82 at 9. The plaintiff argues generally that "a reasonable official in similar circumstances would have reason to believe that his or her own actions would have violated Plaintiff Walker's constitutional rights." Dkt. No. 70 at 27. The court concludes that defendants Jansen and Slinger are not entitled to qualified immunity.

Regarding Jansen, a reasonable correctional officer should know that it might be deliberately indifferent to tell an inmate there was nothing she could do to help when he had just fainted and received medical treatment but he called to tell her that he really did not feel good. A reasonable officer should

know that she should at least check with medical staff before simply telling the inmate to drink some water and lie down.

As to Slinger, a reasonable nurse would know that denying a low bunk restriction to someone with three recent fainting episodes, including two injuries that resulted from falls, could constitute deliberate indifference.

The court will deny the defendants' motion for summary judgment as to Jansen's interaction with the plaintiff on January 2, 2014, and as to Slinger's denial of the plaintiff's low bunk restriction on February 13, 2014.

## IV. CONCLUSION

The court **DENIES** the defendants' motion to dismiss this case for plaintiff's failure to prosecute. Dkt. No. 67.

The court **GRANTS** the defendants' summary judgment as to defendants Kyle Tritt, Michael Vanderbush, Timothy Baumann, Jesse Jones, Greg Strunz and Brian Schmidt. Dkt. No. 41. The court **DISMISSES** defendants Tritt, Vanderbush, Baumann, Jones, Strunz and Schmidt.

The court **DENIES** the defendants' motion for summary judgment as to defendants Lindsey Jansen and Anne Slinger. Dkt. No. 41.

The court will recruit counsel to represent the plaintiff on his surviving claims.

Dated in Milwaukee, Wisconsin this 31st day of August, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**